UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHRISTOPHER VINTON,               )
    Petitioner,               )
                     )        CIVIL ACTION NO.
        v.               )        04-10209-DPW
                     )
DAVID NOLAN,                      )
    Respondent.               )

MEMORANDUM AND ORDER
March 8, 2005

    Petitioner Christopher Vinton seeks habeas corpus relief, pursuant to 28 U.S.C. § 2254, from his state court conviction of first degree murder and sentence to life imprisonment without the possibility of parole. Respondent contends that the several grounds advanced by Petitioner are procedurally defaulted, unexhausted, or -- for those exhausted claims that have already been adjudicated on the merits by the state court -- supported by decisions that were neither contrary to nor unreasonable applications of federal law as determined by the United States Supreme Court. The posture of the claims requires that I consider both procedural and the merits dimensions to Petitioner's several claims. After doing so, I direct dismissal of the petition.

## I. BACKGROUND

**A.    Facts**

When considering habeas corpus petitions made pursuant to 28 U.S.C. § 2254(e)(1), findings of fact by the state court "shall be presumed to be correct" and the applicant for habeas relief "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Id.; see Epsom v. Hall, 350 F.3d 49, 52 (1st Cir. 2003); McCambridge v. Hall, 303 F.3d 24, 34-35 (1st Cir. 2002).  In affirming Petitioner's conviction in the Massachusetts Superior Court, the Supreme Judicial Court of Massachusetts ("SJC") set forth the facts supporting the verdict as follows:[1]

> It is undisputed that on August 3, 1996, after receiving a call from Robert Hippert, the defendant went to an apartment to sell him drugs, as he had done on a number of occasions.  Hippert, Joseph Jablonski, and the victim, Norman Poulin, were in the apartment that evening.  The defendant refused to sell the crack cocaine for less than his asking price of forty dollars, so the victim and the defendant went upstairs to the victim's apartment for the victim to retrieve additional money for the drug purchase.  They came back downstairs and an argument ensued, escalating into a physical confrontation in which the victim pinned the defendant against a door or wall.  Accounts varied as to what happened next, but no one disputes that the victim died as a result of one stab wound inflicted by the defendant. FN1.  [Text of FN1. The medical examiner who conducted an autopsy determined that the cause of death was a single stab wound that penetrated two inches into the left side of the victim's neck, cutting his external carotid artery, an injury consistent with a knife wound.]  The defendant claims he acted in self-defense.
> Jablonski testified that, when the defendant and the victim came back downstairs, the victim asked Jablonski to

_____

[1]All references by the SJC to the "defendant" refer to Christopher Vinton, the Petitioner in this action.

come outside with them, they went to the hallway or front
door, and the victim pushed the defendant against the
outside hallway door.  The victim said to Jablonski, "This
guy won't give me my money back," complaining that the
amount of crack cocaine was too small for forty dollars.
Jablonski testified that the victim had his left forearm
under the defendant's chin and had keys in his hand that
might have had a pen on it.  He heard the defendant say,
"What are you trying to do, stick me with a knife?", but
testified that the defendant did not seem afraid when he
said this.  To his knowledge, the victim did not try to rob
the defendant of any cocaine.  According to Jablonski, after
a few seconds, the victim let the defendant go.  Jablonski
and the victim returned to the apartment.  About one minute
later the defendant knocked on the door, walked up to the
victim, swung his arm once at the victim, and stabbed him.
Jablonski testified that the victim said, "What did you do?
Stab me in the neck?"  The defendant responded, "I didn't
stab you with anything."  The victim started bleeding and
Jablonski wrapped a towel around his neck.  Hippert's
testimony was similar, although he added that the victim may
have also slapped the defendant a bit in the initial
altercation and stated that the defendant returned to the
apartment about five minutes later.

Lisa Bergeron, who was in one of the third-floor
apartments in the building that night, offered the following
testimony.  She knew the defendant by face, having seen him
three or four times a day for about two months, and knew his
car.  That night she saw the defendant go to his car out
front, fumble around inside for about thirty seconds, put
something on the roof of the car, shut the door, and then
get the object from the roof.  The defendant went back into
the building for four or five minutes and then walked
quickly back out to his car.

In contrast to those three witnesses, the defendant
offered the following testimony.  While upstairs with the
victim, he felt that something did not seem right; he went
back downstairs and told Hippert he had to leave.  Hippert
tried to talk him into selling the drugs for less money.  As
the defendant started to leave, the victim grabbed him,
pushed him against the wall, pressed something metal against
his throat and told him that if he did not give them the
drugs he would cut the defendant.  After further struggle,
the defendant spit out the drugs he was holding in his
mouth, but the victim continued to press "his knife into my
throat," and the defendant received "like a slice" on his
throat.  The defendant, thinking that the victim "was going
to kill [him]," grabbed a knife that was on top of the
television and swung it at the victim, then left the house

-3-

and went to his sister's house.  When he got out of his car
at his sister's house, he dropped the knife, and testified
that he did not know exactly where he dropped it.

## B.   Procedural History

On September 12, 1996, Petitioner was indicted for murder.
He was found guilty of first degree murder with malice
aforethought on May 1, 1997, and the same day then-Judge Sosman,
who presided over Petitioner's jury trial in the Massachusetts
Superior Court, imposed a sentence of life imprisonment without
the possibility of parole.  Petitioner timely filed a direct
appeal with the SJC on May 29, 1997.

On April 13, 1998, Petitioner -- who was proceeding pro se
at the time -- filed a motion for a new trial and for an
evidentiary hearing on his motion in the Superior Court.  On June
9, 1998, Petitioner, by this point again represented by counsel,
filed a supplemental motion for a new trial.  Following a
hearing, Judge Sosman denied Petitioner's request for a new trial
on July 2, 1999.

Petitioner appealed this decision to the SJC on July 15,
1998.  In a single decision dated August 1, 2000, the SJC
affirmed both the underlying conviction and the denial of the
motion for a new trial.  Commonwealth v. Vinton, 432 Mass. 180
(2000).

Petitioner filed a second motion for a new trial on August
6, 2001.  The second motion for new trial alleged new ineffective
assistance of counsel grounds -- namely that his trial counsel
(1) had failed to apprise Petitioner of a plea deal offered by

-4-

the prosecutor and (2) had failed to submit the murder weapon for forensic testing, the results of which, Petitioner claimed, would support his self-defense theory, instead advising Petitioner to testify falsely that he did not know the location of the weapon. During a September 27, 2001 hearing regarding the second motion for a new trial, the murder weapon prong of Petitioner's motion was denied as waived in recognition that he had not raised it either in his direct appeal or in his first motion for a new trial.  Petitioner's request for an evidentiary hearing on the non-communicated plea deal prong of his second motion for a new trial, on the other hand, was granted.  On July 25, 2003, Superior Court Judge Fecteau[2] held an evidentiary hearing on the motion, at which Petitioner was represented by appointed counsel. By written decision dated September 23, 2003, Judge Fecteau denied the motion for a new trial on the ground that Petitioner had waived the plea deal issue by failing to raise it in either his direct appeal or his first motion for a new trial.

Pursuant to the Massachusetts "gatekeeper" statute -- Mass. Gen. Laws ch. 278, § 33E[3] – Petitioner sought leave from a single

---

[2]The case was assigned to Judge Fecteau because Judge Sosman, the original trial judge, was no longer a member of the Superior Court, having been appointed to the SJC.

[3]Mass. Gen. Laws ch. 278, § 33E provides, in pertinent part:

If any motion is filed in the superior court after [the SJC issues a decision on a direct appeal in a capital case], no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the [SJC] on the ground that it presents a new and substantial question which ought to be determined by the

justice of the SJC (the "gatekeeper" Justice) to appeal the denial of his second motion for a new trial. By decision dated November 20, 2003, Justice Spina denied Petitioner's request concluding that Petitioner had failed to present a "new and substantial question," as required in order for plenary review to be granted.

Petitioner filed this petition for writ of habeas corpus on January 27, 2004.

## II. DISCUSSION

The five grounds Petitioner asserts for relief are: (1) ineffective assistance of counsel;[4] (2) "inconsistent instructions relative to the Commonwealth's burden of proof in proving manslaughter"; (3) "erroneous instructions on the use of excessive force relative to manslaughter, which lowered the Commonwealth's burden of proof"; (4) "failure to instruct the

---

full court.

[4]Ground One contains the following seven subparts: (a) failing to advise Petitioner of a plea deal allegedly offered by the Commonwealth; (b) instructing Petitioner to lie, denying knowledge of the whereabouts of the murder weapon, and thereby depriving him of exculpatory evidence; (c) failing to introduce photographs taken by trial counsel of an injury to Petitioner's neck and failing to call witnesses to corroborate the injury; (d) failing to withdraw as counsel and testify regarding the injury to Petitioner's neck; (e) failing to introduce photographs of injuries to Petitioner's hands; (f) failing to have the collar of the shirt Petitioner wore on the night in question tested for Petitioner's blood, and to seek funding from the court for this analysis; and (g) failure to call as a witness the police officer who had taken third-party witness Lisa Bergeron's initial statement in order to impeach Ms. Bergeron's trial testimony.
    Agreeing with Respondent that subpart (e) of Ground One is unexhausted because it was never raised in any of the prior state court proceedings, Petitioner has asked to withdraw this claim.

-6-

jury that they must find first prong malice in order to find
defendant guilty of 1st degree murder by means of deliberate
premeditation"; and (5) "ineffective assistance of counsel
(second motion for a new trial ground)."

Respondent contends that Grounds Two through Five and
certain subparts of Ground One are, for various reasons, in
procedural default and thus are foreclosed from review.  As to
the remainder of Ground One, which was addressed by the SJC,
Respondent argues that the underlying state court decision on
this issue cannot be disturbed because it was neither contrary to
nor an unreasonable application of federal law, as determined by
the Supreme Court.

## A.   Standard of Review

This petition for habeas corpus was filed after the
effective date of the Antiterrorism and Effective Death Penalty
Act of 1996 ("AEDPA" or the "Act"), and, therefore, review of the
petition is governed by the revisions to habeas corpus practice
it established.  See, e.g., Medina v. Matesanz, 298 F.3d 98, 100
(1st Cir. 2002); Lindh v. Murphy, 521 U.S. 320, 336 (1997).
AEDPA provided that a federal court shall not grant a writ of
habeas corpus based on a claim that was "adjudicated on the
merits" in a state court proceeding unless that adjudication
"resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States."  28 U.S.C.
§ 2254(d)(1).

By the terms of AEDPA, a necessary predicate to granting habeas corpus relief for a state court decision that was "contrary to" or an "unreasonable application of" Supreme Court precedent is that the claim for which relief is sought was "adjudicated on the merits" in the state court.  28 U.S.C. § 2254(d).  Where, instead, a state court has declined to address a prisoner's federal law claim due to the prisoner's failure to meet a state law procedural requirement, the state court decision rests on "independent and adequate state procedural grounds."  In these circumstances, because of "concerns of comity and federalism," federal habeas review generally is precluded. Coleman v. Thompson, 501 U.S. 722, 729 (1991) ("This Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.  This rule applies whether the state law ground is substantive or procedural.").

The Supreme Court set forth in Coleman those limited circumstances in which federal habeas review is permitted even though the underlying state court decision rests on "independent and adequate" state law grounds:

> We now make it explicit: In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violations of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Id. at 750.  In this context, a "fundamental miscarriage of
justice" is understood to mean the conviction of an innocent
person.  See Murray v. Carrier, 477 U.S. 478, 496 (1986) ("[I]n
an extraordinary case, where a constitutional violation has
probably resulted in the conviction of one who is actually
innocent, a federal habeas court may grant the writ even in the
absence of a showing of cause for the procedural default.").

**B. Procedural Default**

I begin the analysis with Respondent's contention that
Grounds Two through Five and subparts (a) and (b) of Ground One
of Petitioner's habeas petition are procedurally defaulted and
foreclosed from further review.  For the reasons set forth below,
I conclude that Grounds Two through Four are procedurally
defaulted, but find that Ground Five and subparts (a) and (b) of
Ground One are not.

1. Claims Procedurally Defaulted - Grounds Two Through Four

The SJC resolved those aspects of Petitioner's direct appeal
relating to alleged errors in the jury instructions -- which were
re-articulated as Grounds Two through Four of his habeas petition
-- on state law grounds.  After finding that Petitioner had
failed to make the contemporaneous objections necessary to
preserve the claims for full review, the SJC evaluated whether
there was a "substantial likelihood of a miscarriage of justice"
with respect to each of the alleged errors and found no risk of
such harm.  Vinton, 432 Mass. at 188-93.

A decision by a state court that a defendant has

-9-

procedurally defaulted on a claim by failing to object at trial can constitute an "independent and adequate" state law ground "sufficient to trigger the bar [to habeas review] rule so long as the state has a consistently applied contemporaneous objection requirement and the state court has not waived it in the particular case by resting its decision on some other ground." Moore v. Ponte, 186 F.3d 26, 31-32 (1st Cir. 1999) (quoting Burks v. Dubois, 55 F.3d 712, 716 (1st Cir. 1995)).  As it did here, Vinton, 432 Mass. at 188, the SJC has consistently enforced the contemporaneous objection rule[5] such that when a defendant fails to object at trial to alleged errors, the claim of error is not preserved for full review and will be considered by the reviewing court only to determine whether any error "created a substantial likelihood that a miscarriage of justice has occurred." Commonwealth v. Wright, 411 Mass. 678, 681 (1992).

The finding by the SJC that Petitioner failed to preserve his claims regarding alleged errors in the jury instructions by not raising contemporaneous objections to the instructions constitutes an "independent and adequate" state law ground so as to preclude federal habeas review of these claims.  See, e.g., Horton, 370 F.3d at 80-81; Ponte, 186 F.3d at 31-32.  The limited

---

[5]See Mass. R. Crim. P. 22 (general contemporaneous objection rule); Mass. R. Crim. P. 24(b) (contemporaneous objection rule regarding jury instructions) ("No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, specifying the matter to which he objects and the grounds for the objection.").

"miscarriage of justice" review undertaken by the SJC of
Petitioner's claims regarding allegedly defective jury
instructions does not constitute a waiver by the state court of
the procedural default grounds.  See Horton, 370 F.3d at 81.
Accordingly, I will review these claims only if Petitioner meets
the "cause and prejudice" standard discussed in Part II.B.3.,
infra.

2. Claims Not Procedurally Defaulted - Ground Five and Ground
   One, Subparts (a) and (b)

       Because Petitioner did not raise the arguments made in
Ground Five and subparts (a) and (b)[6] of Ground One of his habeas
petition until his second motion for a new trial, the SJC did not
have the opportunity to consider them in its direct review of his
conviction.  Respondent contends that these grounds also are
procedurally defaulted because the state courts that actually
considered them -- i.e., the Superior Court judge who denied
Petitioner's second motion for a new trial and the "gatekeeper"
Justice of the SJC who refused to grant Petitioner leave to
appeal the denial to the full SJC -- found Petitioner had waived
the claims by failing to raise them in his first motion for a new

_____

       [6]With respect to subpart (b) of Ground One, as set forth in
Part I.B., supra, during a preliminary hearing on Petitioner's
second motion for a new trial the trial court denied as waived
that portion of the motion alleging ineffective assistance of
counsel with respect to the treatment of the murder weapon.  In
seeking review under § 33E, Petitioner abandoned the murder
weapon component of his ineffective assistance of counsel
argument, arguing only regarding the alleged failure by his trial
counsel to communicate to him a plea deal supposedly offered by
the Commonwealth.

-11-

trial.

Following direct appeal of a capital conviction in Massachusetts, further review of a defendant's collateral attacks on the conviction in state court will only reach the full SJC if a "gatekeeper" Justice of the SJC determines that the defendant has presented a "new and substantial" claim.[7]  Mass. Gen. Laws ch. 287, § 33E.  The decision of the "gatekeeper" Justice is final and unreviewable.  Commonwealth v. Ambers, 397 Mass. 705, 710-11 (1986); see also Phoenix v. Matesanz, 189 F.3d 20, 24 (1st Cir. 1999).  The First Circuit has held that "[w]here there has been procedural waiver below," as Respondent argues there was here, "the denial of review under § 33E is an independent and adequate state ground that bars federal habeas review" and, furthermore, has characterized this as "the classic example" of such a ground.  Simpson v. Matesanz, 175 F.3d 200, 206-07 (1st Cir. 1999).

The Simpson court went on to explain, however, using a hypothetical, that federal habeas review might be appropriate

---

[7]The SJC has defined "new" in this context as follows:

An issue is not 'new' within the meaning of G.L. c. 287, § 33E, where either it has already been addressed, or where it could have been addressed had the defendant properly raised it at trial or on direct review.  The statute requires that the defendant present all his claims of error at the earliest possible time, and failure to do so precludes relief on all grounds generally known and available at the time of trial or appeal.

Commonwealth v. Ambers, 397 Mass. 705, 707 (1986) (internal quotations omitted) (emphasis in original).

when the denial by the "gatekeeper" Justice of a § 33E petition
rested "on a finding that while petitioner's claim is new, it is,
nonetheless, not substantial -- a conclusion reached by analysis
under and resting on federal law." Id. at 207 n. 4; see also
Phoenix, 189 F.3d at 25.  Thus, the question of whether the
decision by the "gatekeeper" Justice under § 33E regarding
Petitioner's second motion for a new trial is "impervious to
habeas review depends on whether it rests, expressly or
inferentially, on a state-law procedural waiver (or some other
state law consideration), or whether, instead, it involves the
resolution of the merits of [the defendant's] federal
constitutional claim." Phoenix, 189 F.3d at 25.

    I turn now to those two aspects of Petitioner's request for
relief -- Ground Five and subpart (a) of Ground One, each of
which relate to the alleged failure by trial counsel to
communicate to Petitioner a plea deal supposedly offered by the
Commonwealth -- that squarely were addressed by both the Superior
Court judge and the "gatekeeper" Justice in considering
Petitioner's second motion for a new trial.  I leave to one side,
for the moment, subpart (b) of Ground One, which, for reasons
explained in greater detail infra, I find is unexhausted.

    In his decision denying Petitioner's second motion for a new
trial, the Superior Court judge devoted a good deal of analysis
to the merits of Petitioner's ineffective assistance of counsel
claim, which were found wanting.  That analysis, however, was not
the basis for the decision by the Court to deny the motion and

explicitly was offered "[i]n the event that, upon review, this
court's view of the issue of waiver is found to be without
adequate basis, or that appellate counsel's explanation [] is
found to provide an adequate basis, not amounting to waiver."
This type of ruling in the alternative cannot obviate the fact
that the Court's decision rested, principally, on its finding
that Petitioner had waived the claim by failing to raise it in
the course of prior proceedings -- either his first motion for a
new trial or his direct appeal -- during which time he was
represented by new counsel and had ready access to the records of
his trial counsel, including the particular document that
allegedly indicated the offer of a plea deal.  I find, therefore,
that the decision of the Superior Court judge hearing the second
motion for a new trial was predicated upon a finding of
procedural default.  The subsequent decision of the "gatekeeper"
Justice, however, presents a more complicated question.

    In his Memorandum and Order denying Petitioner leave to
appeal the denial of his second motion for a new trial to the
full SJC, the "gatekeeper" Justice noted that "[t]he problem with
[Petitioner's ineffective assistance of counsel] argument is that
the motion judge found that this argument could have been raised
in the defendant's first motion for a new trial, and is therefore
waived."  The "gatekeeper" Justice went on to summarize the
findings by the Superior Court judge on the merits of the claim,
before concluding in the third and final paragraph of his
Memorandum and Order that the motion did not "present[] a new and

-14-

substantial question which ought to be determined by the full court," Mass. Gen. Laws ch. 278, § 33E, as it must to warrant appellate review.  The two sentences that follow this conclusion suggest a merits basis:

> Trial counsel's file note about his conversation with the prosecutor, on which defendant's claim is based, does not evidence an offer to allow the defendant to present a guilty plea to murder in the second degree, but only supports an inquiry as to the defendant's interest.  Moreover, the issues raised in the defendant's second motion for a new trial could have been raised in his first motion for a new trial.

The reasoning set forth in the underlying decision, which the "gatekeeper" Justice effectively affirmed, was that the claims on which Petitioner based his second motion for a new trial were waived due to his failure to raise them previously.  The language in the final paragraph of the "gatekeeper" Justice's decision, however, particularly the use of the word "moreover," suggests that the decision by the state's highest court rested, at least in part, on the consideration of the merits of the ineffective assistance of counsel claim made by Petitioner.

It is established that "[i]f the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal court review that might otherwise have been available."  Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991). Federal habeas review still might be impermissible if the state court based its assessment of the merits only on state law.  See Phoenix, 189 F.3d at 26.  Although the Memorandum and Order by the "gatekeeper" Justice cites neither to state nor federal law,

Petitioner explicitly grounded his ineffective assistance claim in both bodies of law and the lower court cited both in its belt and suspenders resolution of the claim. Because these claims were adjudicated on the merits by the highest state court to address them, I find that they must now be reviewed under the "contrary to" and "unreasonable application of" standards set forth above, rather than the "cause and prejudice"/actual innocence standard applicable to procedurally defaulted claims. I do so in Part II.D.2., infra.

3. Review for "Cause and Prejudice" - Grounds Two Through Four

In light of the "independent and adequate" state law grounds for the state court decisions on Grounds Two, Three, and Four of his petition for habeas corpus, Petitioner is entitled to federal habeas review of these claims only if he demonstrates either "cause and prejudice" with respect to the procedural default, or actual innocence, a contention he does not advance.

To demonstrate the requisite cause, Petitioner must demonstrate "that some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule." Carrier, 477 U.S. at 488; see Horton 370 F.3d at 81; Gunter, 291 F.3d at 81. The Carrier court noted, "without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule," that "a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause under the

standard." <u>Carrier</u>, 477 U.S. at 488 (internal quotations and citations omitted). Ineffective assistance of counsel might also constitute cause for procedural default, but only if the ineffectiveness itself reached the level of "an independent constitutional violation." <u>Coleman</u>, 501 U.S. at 755; <u>see</u> <u>Carrier</u>, 477 U.S. at 488; <u>Gunter</u>, 291 F.3d at 81.

Before his procedurally defaulted claims can be opened up to federal habeas review, therefore, Petitioner must first satisfy his burden of "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law." <u>Coleman</u>, 501 U.S. at 750; <u>see</u> <u>Burks</u>, 55 F.3d at 716 (holding that "a state court decision resting upon a finding of procedural default . . . forecloses federal habeas review unless the petitioner can demonstrate cause for the default and prejudice stemming therefrom"). Nowhere in his original petition or in his opposition to Respondent's motion to dismiss does Petitioner offer any factual support for or make any arguments regarding cause for his procedural default. Nor is any support apparent in the record. The burden of demonstrating "cause and prejudice" was Petitioner's to satisfy; because of his failure to do so, he is not entitled to further review of his procedurally defaulted claims, <u>i.e.</u>, Grounds Two, Three, and Four of his habeas petition.

**C. Unexhausted Claim - Ground One (subpart (b) (Murder Weapon Claim))**

In his § 33E petition seeking permission to appeal to the SJC the denial of his second motion for a new trial, Petitioner did not contest that procedural waiver barred further review of that aspect of his ineffective assistance of counsel claim related to the murder weapon (hereinafter the "murder weapon claim"), which is raised again in subpart (b) of Ground One in the present petition, and, in fact, made no mention of this issue in his papers. The Commonwealth did not address this issue in its written opposition to the § 33E petition and it also was not raised in the decision of the SJC "gatekeeper" Justice denying Petitioner's request for leave to appeal. Although Respondent now attempts to sweep this claim within the ambit of those exhausted claims found procedurally defaulted by the state court in Petitioner's second motion for a new trial, this effort is unavailing.

In order for a claim to be exhausted, Petitioner must have "presented both the factual and legal underpinnings of his claim to the state courts." Jackson v. Coalter, 337 F.3d 74, 86 (1st Cir. 2003) (quoting Nadworny v. Fair, 872 F.2d 1093, 1096 (1st Cir. 1989)); see also 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."). In his § 33E petition, Petitioner -- then represented by counsel -- apparently made a strategic decision to leave by the wayside the murder weapon aspect of his ineffective

assistance argument and focus solely on the non-communicated plea deal issue. In doing so, however, he also abandoned a necessary predicate for federal habeas review of the claim, namely that he first "fairly present -- or do his best to present -- the issue to the state's highest tribunal." Mele v. Fitchburg Dist. Court, 850 F.2d 817, 820 (1st Cir. 1988).

Having found that Petitioner has raised an unexhausted claim and, as a result, that his petition for habeas relief is a "mixed" one containing both exhausted and unexhausted claims, a choice arises regarding how next to proceed. Recent First Circuit precedent suggests that staying the proceedings while Petitioner presents his unexhausted claim to state court would be the appropriate approach. See, e.g. Nowaczyk v. Warden, N.H. State Prison, 299 F.3d 69, 79 (1st Cir. 2002)(commenting that "district courts presented with mixed petitions should take seriously any request for a stay" because of the strict time limitations imposed by AEDPA); Neverson v. Bissonnette, 261 F.3d 120, 126 n.3 (1st Cir. 2001) (noting that staying proceedings is "the preferable course in many cases involving 'mixed' petitions -- and it may be the only appropriate course in cases in which an outright dismissal threatens to imperil the timeliness of a collateral attack"). Another option is to deny the petition on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); see also Duncan v. Walker, 533 U.S. 167, 191

(2001) (Breyer, J., dissenting) (describing how prisoners who
bring unexhausted claims to federal court risk the claims being
denied on the merits pursuant to § 2254(b)(2)). I select the
latter course for the following reasons.

As set forth above, Petitioner first raised the murder
weapon claim in his second motion for a new trial. During a
preliminary hearing on the motion, the presiding Superior Court
judge found that Petitioner had waived the argument because he
had the opportunity to raise it in his direct appeal or his first
motion for a new trial, but had failed to do so. The reason the
murder weapon claim is unexhausted for present purposes is
because when later seeking leave from the SJC "gatekeeper"
Justice to appeal the subsequent denial of his second motion for
a new trial, Petitioner made no mention of the claim and,
accordingly, the "gatekeeper" Justice did not reach it in his
decision.

Thus, while the Superior Court made a determination that the
murder weapon claim was procedurally barred, the claim is
unexhausted because Petitioner had the right to, but did not,
raise it in his § 33E petition. It is obvious, however, that
should Petitioner return to state court for further consideration
of the murder weapon claim, the effort would be futile and the
finding by the Superior Court that the claim was waived would be
upheld. Rather than engage in an exercise the Eleventh Circuit
has termed "judicial ping-pong," Snowden v. Singletary, 135 F.3d

732, 736 (11th Cir. 1998),[8] I will reach and dispose of the

murder weapon claim on the merits, which, in this case,

implicates state procedural rules.

The issue of waiver is addressed by Mass. R. Crim. P. Rule

30, which governs post-conviction relief and provides, in

relevant part, that:

> *Waiver*. All grounds for relief claimed by a defendant under
> subdivisions (a) and (b) of this rule shall be raised by the
> defendant in the original or amended motion. Any grounds
> not so raised are waived unless the judge in the exercise of
> discretion permits them to be raised in a subsequent motion,
> or unless such grounds could not reasonably have been raised
> in the original or amended motion.

Id. at (c)(2).[9]

---

[8]In Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir.
1998), the Eleventh Circuit held that:

> [W]hen it is obvious that the unexhausted claims would be
> procedurally barred in state court due to state-law
> procedural default, we can forego the needless 'judicial
> ping-pong' and just treat those claims now barred by state
> law as no basis for federal habeas relief.  And, in this
> case, where all the unexhausted claims are procedurally
> barred from being considered in Florida courts, it would
> serve no purpose to dismiss the petition for further
> exhaustion because review of those claims is unavailable in
> state courts.

[9]The referenced portions of the Mass. R. Crim. P. Rule 30
provide as follows:

> (a) **Unlawful restraint.**  Any person who is imprisoned or
> whose liberty is restrained pursuant to a criminal
> conviction may at any time, as of right, file a written
> motion requesting the trial judge to release him or her or
> to correct the sentence then being served upon the ground
> that the confinement or restraint was imposed in violation
> of the Constitution or laws of the United States or of the
> Commonwealth of Massachusetts.

> (b) **New Trial.**  The trial judge upon motion in writing may
> grant a new trial at any time if it appears that justice may

As noted above, the Superior Court judge hearing
Petitioner's second motion for a new trial declined to exercise
his discretion to forgive Petitioner's waiver of the murder
weapon claim.  The SJC has instructed that the "discretionary
power to give relief from such a waiver by permitting such issues
to be raised for the first time by a motion for a new trial
should be exercised only in those extraordinary cases where, upon
sober reflection, it appears that a miscarriage of justice might
otherwise result."  Commonwealth v. Harrington, 379 Mass. 446,
449 (1980).  The standard of review applicable to the denial of a
post-appeal motion for a new trial -- which is identical whether
or not the motion judge addressed the merits of the claim -- is
whether there was a "substantial risk of a miscarriage of
justice."  Commonwealth v. Azar, 435 Mass. 675, 685 (2002)
(citing Commonwealth v. Curtis, 417 Mass. 619, 624 n.4 (1994)).
As a result, had Petitioner appealed the murder weapon claim to
the SJC, pursuant to the "substantial risk" standard the Court
would have "determine[d] if we have a serious doubt whether the
result of the trial might have been different had the error not
been made," Azar, 417 Mass. 687 (internal quotations and citation
omitted), and ordered a new trial "only in the extraordinary

---

not have been done.  Upon the motion the trial judge shall
make such findings of fact as are necessary to resolve the
defendant's allegations of error of law.

Id. at (a) and (b) (emphasis in original).

situation where . . . we are left with uncertainty that the
defendant's guilt has been fairly adjudicated." Id. (internal
quotations and citation omitted).

"[I]n determining whether a remedy for a particular
constitutional claim is 'available,' the federal courts are
authorized, indeed required, to assess the likelihood that a
state court will accord the habeas petitioner a hearing on the
merits of his claim." Carsetti v. Maine, 932 F.2d 1007, 1012
(1st Cir. 1991) (quoting Harris v. Reed, 489 U.S. 255, 268 (1989)
(O'Connor, J., concurring)) (alteration in original); see Hall v.
DiPaolo, 986 F.2d 7, 10 (1st Cir. 1993).  The task for this
habeas court, therefore, is to consider how Petitioner's murder
weapon claim would fare in the SJC under the "substantial risk of
a miscarriage of justice" standard.

Petitioner has maintained consistently that the murder
weapon was a "box cutter" that he "grabbed from the top of a
television while being attacked in the [victim's] house."  In his
second motion for a new trial, Petitioner contended that he had
informed trial counsel of the whereabouts of the murder weapon --
which he claimed to have thrown down a storm drain near his
sister's house -- but was advised by counsel to deny knowledge of
the weapon's location and followed this advice in the course of
his testimony at trial.  In his second new trial motion,
Petitioner argued that recovery of the murder weapon would have
served three purposes: (1) the identification of the victim's or

-23-

third parties' fingerprints on the murder weapon would have "validated [Petitioner's] and destroyed the Commonwealth's" version of events; (2) "the weapon may have been shown to witnesses or prior visitors to the house for identification purposes"; and (3) Petitioner "could have avoided the clearly incredible testimony that 'he did not know exactly where he dropped'" the murder weapon.

    As discussed at length in Part II.D.1., <u>infra</u>, this case turned on the question of whether Petitioner had the opportunity to escape and avoid combat before he committed the fatal stabbing. Petitioner's allegations about this evidence and its potential probative value -- the presence of the victim's fingerprints on the murder weapon, the identification of the weapon by witnesses as something that previously was located in the victim's apartment, and the increase in credibility Petitioner might have been accorded by the jury had he testified about where, exactly, he disposed of the weapon -- even if true, could not serve to answer this determinative question in Petitioner's favor. Accordingly, I find that there was no "substantial risk of a miscarriage of justice" on account of trial counsel's treatment of the murder weapon.

    Furthermore, Petitioner has made no showing that the murder weapon claim "could not reasonably have been raised" in his first motion for a new trial. Petitioner was represented by successor counsel when proceeding on his first motion for a new trial --

or, more precisely, upon the amended motion filed by counsel
after Petitioner first filed a pro se motion for new trial -- and
the facts underlying the murder weapon claim were readily
ascertainable.

I find, therefore, that the murder weapon claim has been
waived.  Because the claim is not colorable on its face -- should
Petitioner attempt to present it to a state court, the court
would deny it as procedurally barred -- it cannot provide
Petitioner with a basis for habeas relief.

**D. Exhausted Claims**

Remaining, then, are those claims addressed on the merits by
the state court, either the SJC in its consideration of
Petitioner's direct appeal or the "gatekeeper" Justice of the SJC
who ruled upon Petitioner's § 33E application to appeal the
denial of his second motion for a new trial to the full SJC.[10]
In reviewing the state court determinations on these claims, the
question is whether those decisions were "contrary to" or "an
unreasonable application of" Supreme Court precedent.

In Williams v. Taylor, 529 U.S. 362, the Supreme Court
discussed two ways in which a state court decision could be
"contrary to" its precedent within the meaning of AEDPA.  First,
when a state court "applies a rule that contradicts the governing
law set forth in our cases," the resulting decision is "contrary
to" Supreme Court precedent.  Id. at 405.  The "contrary to"

_____

[10]As discussed supra in footnote 4, Petitioner has asked to
withdraw subpart (e) of Ground One.

clause of AEDPA also is satisfied when a state court "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."  Id. at 406.

A state court decision constitutes an "unreasonable application of" of Supreme Court precedent when:

> the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case . . . [or] the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Id. at 407.  That the reviewing court disagrees with the result reached by the state court does not necessarily satisfy the "unreasonable application" test, for "[t]o be an unreasonable application of governing law, the state court's determination must not only be incorrect but also be objectively unreasonable. In other words, if the petition presents a close call, it must be rejected, even if the state court was wrong."  Horton v. Allen, 370 F.3d 75, 80 (1st Cir. 2004) (internal citations omitted); see also Taylor, 529 U.S. at 411 ("[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.").

1. Claims Reviewed by Full SJC

In resolving the direct appeal by Petitioner of his first

degree murder conviction, the SJC had the opportunity to consider four of the constituent parts to the ineffective assistance of counsel claim Petitioner now presses in seeking habeas relief: (1) the failure by counsel to present credible evidence corroborating his self-defense claim (subparts (c) and (d) of Ground One in the habeas petition); (2) the failure by counsel to have Petitioner's blood-stained shirt tested for the presence of Petitioner's blood (subpart (f) of Ground One); and (3) the failure by counsel sufficiently to impeach the "one presumed unbiased witness in the case," Lisa Bergeron (subpart (g) of Ground One).

Because Petitioner's conviction was for first degree murder, the SJC, in considering his ineffective assistance of counsel claim, utilized the "substantial likelihood" standard of § 33E, which presents a "lower barrier to clear with respect to an error at trial not objected to" than is applicable to a "similarly situated defendant in an appeal of a non-capital case." Commonwealth v. Wright, 411 Mass. 678, 681 (1992); see Commonwealth v. Allen, 430 Mass. 252, 255 (1999).  The SJC has characterized this standard as "more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel", Wright, 411 Mass. at 681-82 (citing Commonwealth v. Saferian, 366 Mass. 89, 96 (1974),[11] and

_____

[11]Regarding ineffective assistance of counsel claims, the SJC held in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974) that:

Strickland v. Washington, 466 U.S. 668, 687 (1984),[12] for the
standards applicable under the state and federal constitutions,
respectively), and the First Circuit has held that the § 33E
standard was "at least as favorable" as the federal standard set
forth in Strickland.  Mello v. DiPaulo, 295 F.3d 137, 145 (1st
Cir. 2002).

     In any event, in applying the § 33E standard in the course
of resolving Petitioner's appeal, the SJC "inquire[d] whether

_____

     what is required in the actual process of decision of claims
     of ineffective assistance of counsel, and what our own
     decisions have sought to afford, is a discerning examination
     and appraisal of the specific circumstances of the given
     case to see whether there has been serious incompetency,
     inefficiency, or inattention of counsel -- behavior of
     counsel falling measurably below th[at] which might be
     expected from an ordinarily fallible lawyer -- and, if that
     is found, then, typically, whether it has likely deprived
     the defendant of an otherwise available, substantial ground
     of defen[s]e.

[12]In Strickland v. Washington, 466 U.S. 668, 687 (1984), the
Supreme Court set forth the two-part test a defendant must meet
to establish ineffectiveness of counsel rising to the level of a
constitutional violation:

     A convicted defendant's claim that counsel's assistance was
     so defective as to require reversal of a conviction or death
     sentence has two components. First, the defendant must show
     that counsel's performance was deficient. This requires
     showing that counsel made errors so serious that counsel was
     not functioning as the "counsel" guaranteed the defendant by
     the Sixth Amendment. Second, the defendant must show that
     the deficient performance prejudiced the defense. This
     requires showing that counsel's errors were so serious as to
     deprive the defendant of a fair trial, a trial whose result
     is reliable. Unless a defendant makes both showings, it
     cannot be said that the conviction or death sentence
     resulted from a breakdown in the adversary process that
     renders the result unreliable.

there was any error or serious failure by trial counsel and, if
so, whether the error or failure created a substantial likelihood
of a miscarriage of justice." <u>Vinton</u>, 432 Mass. at 183.  The SJC
employed a two-step approach in conducting its analysis, first
discussing Petitioner's overarching ineffectiveness argument and
then considering the specific items of "corroborative" evidence
Petitioner argued should have been adduced.  I review its
findings in the same fashion.

      The gist of Petitioner's ineffective assistance argument to
the SJC was that "because the case turned on his credibility,"
his trial counsel "should have presented corroborative evidence
to support his self-defense claim, particularly concerning his
testimony that he received 'like a slice' from a metal object the
victim held against his neck," and that the decision by counsel
not to do so was manifestly unreasonable.  The SJC acknowledged
that the prosecutor, in his closing argument, "repeatedly focused
on the defendant's claim that his neck was injured by the victim,
asserting that the claim was a 'bald-faced lie,' and that this
lie revealed the defendant's lack of credibility concerning the
events in the apartment on the night of the stabbing." <u>Id.</u> at
184.  The SJC found, however, that "defense counsel's own closing
argument effectively anticipated and largely preempted the
prosecution's closing argument on this point." <u>Id.</u>[13]  Even more

---

      [13]In reaching this conclusion, the SJC quoted relevant
sections of the closing arguments.  From the prosecution's
closing, the SJC recited the following:

injurious to Petitioner's argument was the conclusion by the SJC
that "the critical question in this trial was whether the
defendant had an opportunity to escape and avoid combat," a
matter on which, according to the SJC, whether Petitioner had
been cut in the neck by the victim "had little direct bearing."
Id. The Court explained its reasoning thus:

> Even assuming that the failure to put forward the desired
> corroborative evidence weakened the credibility of the
> defendant generally--an assumption we are not convinced is
> sound--in the face of testimony from three witnesses that
> the defendant left and then returned before the stabbing,
> the failure by counsel to put forward this evidence is

---

> [P]erhaps one of the most important pieces of evidence to
> come in was the [booking] photographs of the defendant.
> It's important because it begins to tell you is this
> defendant telling you the truth when he gets up on that
> witness stand or is he lying. . . . [T]his jumps out at you
> as a tremendous aid because it is a photograph or two
> photographs.  And they show his neck.  And there is no
> injury to his neck.  So that is a bold-faced lie.  He's
> lying to you.  You take that lie and you take it to the rest
> of the case because that's lying to you about what happened in
> the apartment and that's critical. . . .  Does the crack
> dealer take a knife into the house when he goes in[...]?  Of
> course he does. . . .  It doesn't come off the television
> set.  You should lump that together with the cut on [his]
> neck. . . .  Look at that photograph of Mr. Vinton's neck if
> there is any question in your mind as to who is telling the
> truth.

Vinton, 432 Mass. at 184 n.4.  From defense counsel's closing
argument, the SJC set forth this excerpt:

> The suggestion may be made by the prosecution, take a look
> at these photos, the mugshots [showing] that Mr. Vinton
> wasn't hurt.  You don't see marks on his neck.  That is not
> the standard.  What the standard is is whether from the
> defendant's point of view, his self-defense was reasonable,
> whether he felt that faced with this attack, that what he
> did was reasonable to defend himself from death or great
> bodily injury.

Id. at 184 n.5.

> unlikely to have influenced the verdict. Consequently, it
> could not have created a substantial likelihood of a
> miscarriage of justice, particularly given Bergeron's
> testimony.

Id. In other words, even had Petitioner's credibility been

enhanced via the introduction of evidence corroborating his

account of having received "like a slice" in his neck from the

victim, it remained unlikely that the jury would credit his

testimony, that he stabbed the victim in the course of defending

himself against attack, over the testimony of three eyewitnesses

who swore to his having left the apartment, gone to his car, and

then returned to the apartment before stabbing the victim -- a

sequence of events indicating that Petitioner had the opportunity

to escape and avoid combat, thereby rendering his self-defense

argument baseless. See Epsom v. Hall, 330 F.3d 49, 54 (1st Cir.

2003) (holding that "under Massachusetts law, the defendant no

matter how provoked or put in fear is effectively required to

retreat before the use of deadly force if he can do so with

safety" and that an offense reduction from first degree murder to

manslaughter is unavailable "if the duty to retreat is not

satisfied") (citing Commonwealth v. Roberts, 433 Mass. 45, 56

(2000) and Commonwealth v. Curtis, 417 Mass. 619, 632 & n.11

(1994)). Having established this conceptual framework, the SJC

went on to address the particular evidence Petitioner argued his

trial counsel should have adduced.

a. Additional photographs of neck injury

Before accompanying Petitioner to the police station to

surrender the day after the stabbing, trial counsel met
Petitioner at his apartment, interviewed him and several members
of his family, and took photographs of the injury to his neck.
According to an affidavit of Petitioner, trial counsel commented
at the time he took the photographs that they would be "key
evidence" in the case.  Counsel did not offer the photographs at
trial, however, and the only photographic evidence regarding
Petitioner were the police booking photographs introduced by the
prosecutor, photos that, again according to Petitioner's
affidavit, "did not show the cut on my neck because of the camera
angle."  Petitioner reported that trial counsel informed him
during the course of trial preparation that he did not plan to
use the photographs counsel had taken because, in counsel's
words, the cut "looked like a cat scratch" in the photos, "we'll
be laughed out of court with these," and "the jury may think that
you inflicted the wound yourself."

     The SJC agreed with the conclusion of the motion judge who
denied Petitioner's first motion for a new trial that the
photographs taken by counsel were "a 'double-edged sword' with
the 'potential to backfire on the defendant,' perhaps outraging
the jury that a fatal stabbing would be committed 'over an injury
this minor.'"  The SCJ reasoned further that what was shown in
the photographs -- "like a catch scratch," as described by
Petitioner's trial counsel; "a pressure point and a scratch," in
the words of his appellate counsel -- differed sufficiently from
Petitioner's description of his injury as "like a slice" that the

-32-

photographs "could have undermined defendant's credibility more
than they helped him." Vinton, 432 Mass. at 185.  Based on these
problems with the evidence, the SJC concluded that the decision
by trial counsel not to introduce the photographs was not
"manifestly unreasonable."  Id.

     As the First Circuit has held, "[t]rial lawyers make
countless tactical choices and unless the net reckoning is
'patently unreasonable,' counsel's judgment is not
constitutionally defective." Epsom v. Hall, 330 F.3d 49, 54 (1st
Cir. 2003) (quoting Phoenix v. Matesanz, 233 F.3d 77, 82 n.2 (1st
Cir. 2000)).  Here, Petitioner's trial counsel apparently
conducted a rational cost-benefit analysis regarding the
photographs and determined that the risks they posed -- in terms
of undermining Petitioner's credibility and possibly inflaming
the passions of the jury -- outweighed any advantage they might
confer in supporting Petitioner's claim of self-defense.

     Even were I to disagree with the SJC's conclusion that this
strategic decision was not "manifestly unreasonable" -- and I do
not -- Petitioner still would fall short of the mark.  To prevail
on an ineffective assistance claim in the habeas corpus context,
"even a badly flawed judgment is not enough: to show prejudice,
the likelihood of a different result must be reasonably high."
Epsom, 330 F.3d at 54 (citing Strickland, 466 U.S. at 694).
Petitioner has failed to make such a showing.  There is no basis
for finding that were the jury to have received additional
evidence of the injury to Petitioner's neck it would have gone on

to conclude -- in the face of contrary evidence from three eyewitnesses -- that Petitioner did not have the opportunity to escape and avoid combat and therefore was entitled to reduction based on self-defense.  The ruling by the SJC that the decision by trial counsel not to introduce the additional photographs was not "manifestly unreasonable," and therefore did not constitute ineffective assistance of counsel, was not "contrary to" or an "unreasonable application of" Supreme Court precedent.  As a result, Petitioner is not entitled to habeas relief on this claim.

b. Witnesses regarding neck injury

    Petitioner argued that trial counsel not only erred generally by failing to call witnesses to corroborate the neck injury, but also erred by not withdrawing as counsel and himself giving testimony as he was, according to Petitioner, the "best evidence" of the injury.  In reviewing this claim, the SJC began by reciting the evidence that was before the jury on the issue of the neck injury, specifically: "the blood on the defendant's shirt collar; Jablonski's testimony that the defendant had said 'What are you trying to do, stick me with a knife?,' as the victim had keys in his hand; as well as the defendant's own testimony that his neck was cut by the victim." Vinton, 432 Mass. at 186.  Acknowledging the extent to which the prosecution focused in its closing argument on the absence of competent evidence regarding the injury, when it went so far as to term the supposed wound a "bold-faced lie" by Petitioner, the Court

allowed that it was "arguable that it might have been better for counsel to have called witnesses to support the evidence that the defendant had received a cut or scratch." Id. But relying on the well-established proposition that the advantages of hindsight should not factor into its assessment of trial strategy, id. (citing Commonwealth v. Drumgold, 423 Mass. 230, 262 (1996)), the Court concluded that the decision by trial counsel not to call corroborating witnesses regarding the neck injury was not "manifestly unreasonable." Id. As important, for present purposes, was the next sentence, in which the Court found that the testimony of the witnesses, had it been put on, "would not have directly aided the defendant regarding the central issue," i.e., whether he left the apartment before returning to it to stab the victim. Id. (citing Commonwealth v. Sarmanian, 426 Mass. 405, 407-08 (1998) (holding failure to call additional witnesses whose testimony "would have been cumulative, not dispositive" did not constitute error)).

This analysis parallels the rubric employed above: for Petitioner to prevail on his ineffective assistance claim, demonstrating a "badly flawed judgment" is not enough, he must also establish that the "likelihood of a different result" was "reasonably high." Epsom, 330 F.3d at 54 (citing Strickland, 466 U.S. at 694). For the same reasons developed in the discussion of the photographic evidence, here as well Petitioner has not made -- and cannot make -- this showing. Accordingly, there is no basis for habeas relief on this claim.

The SJC disposed in a footnote of Petitioner's argument that trial counsel had erred by not withdrawing as counsel and himself offering testimony regarding the neck injury. <u>Vinton</u>, 432 Mass. at 185 n.7.  In concluding that Petitioner had failed to demonstrate the need for counsel to testify, the Court pointed to the other available witnesses who would could speak to the injury and, if deemed necessary, to the failure of the photographs to accurately depict the nature of it.  <u>Id.</u>  The Court contrasted these circumstances to those confronted in <u>Commonwealth v. Rondeau</u>, 378 Mass. 408 (1979), where counsel was the only alibi witness who could not be impeached by evidence of a criminal record and whose failure to withdraw and testify for his client, when the need for his testimony was apparent, was found to be "sufficiently below the required standard of professional conduct" to constitute ineffective assistance of counsel and justify a new trial.  <u>Rondeau</u>, 378 Mass. at 413, 416-17.

Finding the analysis by the SJC on this issue sound, and not, in any event, "clearly contrary to" or "an unreasonable application of" Supreme Court precedent, I conclude Petitioner is not entitled to habeas relief on the basis that his trial counsel did not withdraw and give testimony.

c. <u>Testing of blood-stained shirt</u>

In another theme and variation on the neck injury argument, Petitioner contended that trial counsel erred by not acceding to his request to seek court-funding to test the blood on the collar of the shirt he wore on the night of the stabbing.  The rationale

offered by Petitioner for this argument was that scientific proof the blood was his would have bolstered his contention that he had suffered an injury to his neck at the hands of the victim, thereby supporting his self-defense theory.  In its analysis of this issue, the Court first highlighted the "concession" by Petitioner that the jury already had before it evidence of the blood on his shirt-collar (i.e., the shirt itself, which the prosecution introduced in evidence) and noted that the prosecution had not argued that the blood was the victim's.  The Court went on to conclude that because identifying the source of the blood would not aid in the resolution of the "central issue on which the defendant's conviction hinged" -- i.e., his opportunity to escape and avoid combat -- the decision by trial counsel not to request funds for testing the shirt was not "manifestly unreasonable."

In support of this conclusion, the Court distinguished the case Petitioner relied upon regarding this issue in his appeal brief, Commonwealth v. Conley, 43 Mass. App. Ct. 385 (1997), in which the failure by trial counsel to have a knife recovered from the crime scene tested for the presence of the defendant's blood was found to be "manifestly unreasonable."  Id. at 395.  The basis for this distinction was the potential effect of the evidence in question: had the defendant's blood been found on the knife in Conley, as he claimed it would be, "the credibility of the alleged victims would have been seriously weakened, if not destroyed" in a case where the prosecution's case "depended

almost entirely on their testimony." Id. at 395.  Here, by contrast, scientific evidence that blood on his shirt-collar was Petitioner's would have dealt no fatal blow to the prosecution's case.

As discussed at length supra, whether the victim injured Petitioner's neck is not determinative of the key question: whether Petitioner attacked the victim only after leaving and then returning to the apartment.  Furthermore, one of the eyewitnesses to the crime, Jablonski, testified that Petitioner had exclaimed to the victim, "What are you trying to do, stick me with a knife?"  Because Jablonski's testimony already allowed for the possibility that the victim had injured Petitioner's neck, proof that Petitioner had bled onto his shirt collar would not have "seriously weakened" or "destroyed" Jablonski's credibility in the eyes of the jury.

Once again, I find no basis for disagreeing with the conclusion of the SJC.  As a result, Petitioner is not entitled to habeas relief upon this claim.

d. Impeachment witness regarding Bergeron

The final of Petitioner's ineffective assistance of counsel claims addressed by the SJC was that his trial counsel erred by not calling the police officer who made the report of third-party witness Lisa Bergeron's statement to the police.  As recited in the report, Bergeron told the police that she "saw this guy leaving the building.  He was walking real calm."  At trial, by contrast, Bergeron testified that she had observed Petitioner

-38-

leave the building; go to his car; retrieve something from the car and place it on the roof temporarily as he closed the car door; return to the building; and, a few minutes later, exit the building a second time, now walking "quickly" to his car and driving off with his tires screeching.  The police report made no mention of Bergeron having observed Petitioner leave the building twice, having retrieved something from his car in the meantime.

On one point, the SJC did not disagree with Petitioner: impeaching Bergeron was "indisputably important to the defense." As the SJC noted in assessing this issue, Bergeron's testimony had been identified by the prosecution in its closing argument as "critical evidence" of premeditation on the part of Petitioner -- i.e., his leaving the scene of the dispute and thereafter returning to it and committing the stabbing -- and both other witnesses who verified the chronology she described, Jablonski and Hibbert, were "friends of the victim, with criminal records, who had been drinking that day and were possible participants in the drug deal that lead to the altercation." Id. at 187.  The SJC differed with Petitioner, however, regarding the necessity of calling the police officer as a witness in order to accomplish the impeachment.

The SJC found that "Bergeron was impeached by the defense," id. (emphasis in original), through the utilization of (1) cross-examination in which trial counsel highlighted the inconsistences between her initial statement to the police and her subsequent trial testimony, and (2) putting on the testimony of a private

-39-

investigator who had interviewed Bergeron by phone six days after the stabbing and to whom she had made no mention of having seen Petitioner leave the building two times.  Id.   The SJC determined that "[c]alling the officer who made the report might have added little to the defense and could have been risky . . . it was unclear what the officer would say and whether his testimony would help or harm the defendant."  Based upon this reasoning, the SJC found that the failure to call the police officer "did not constitute ineffectiveness" by trial counsel. Id.

According to Petitioner, Bergeron resisted the impeachment by claiming that the inconsistency between the police report and her trial testimony was attributable to the police officer having failed to take accurate notes of what she told him.  Petitioner further alleges that trial counsel never even contacted the police officer to find out what his testimony might be.  Perhaps trial counsel could have inquired of the police officer and queried him on his recollection of his interview with Bergeron and his usual practice when interviewing witnesses (e.g., taking detailed notes of the witness's comments, reviewing the statement with the witness for accuracy), and then made an informed decision about whether to call him as a witness.

Although I have some modest reservations about certain aspects of the SJC's analysis regarding this issue, I do not find that its determination was "contrary to" or an "unreasonable application of" Supreme Court precedent.  Even assuming, for the

-40-

sake of argument, that trial counsel had called the police officer and he had testified that he wrote down everything Bergeron told him about the incident, I cannot find that there was a "reasonably high likelihood" that the jury would have reached a different result.  Epsom, 330 F.3d at 54.  The jury already had before it ostensibly reliable, unbiased testimony that called into question Bergeron's credibility -- the private investigator who interviewed her within a week of the stabbing and to whom she made no mention of having seen Petitioner leave the building twice.  The testimony of the police officer would have been "cumulative, not dispositive," Sarmanian, 426 Mass. at 407-08, regarding the issue of Bergeron's credibility.  The failure to put on this evidence -- assuming it even was available -- may have been an error in judgment, but it did not constitute ineffective assistance of counsel.

2. Claims Reviewed by "Gatekeeper" Justice

    As discussed supra in Part II.B.2., in denying Petitioner leave to appeal his second motion for a new trial to the full SJC, the "gatekeeper" Justice appeared to reach the merits of Petitioner's claim that his trial counsel was ineffective because he had failed to advise Petitioner of a plea deal purportedly offered by the Commonwealth.[14]  In reaching his conclusion that the claim did not present a "new and substantial question which ought to be determined by the full court", Mass. Gen. Laws ch.

---

    [14]Petitioner raises this claim as Ground One, subpart (a), and also Ground Five of his petition for habeas relief.

278, § 33E, the "gatekeeper" Justice referenced three specific

factual findings made by the Superior Court judge who had denied

the motion for a new trial:[15]

> The judge also found, based on strong support in the record,
> that even if the defendant had not waived the issue, the
> prosecutor had not offered to allow the defendant to present
> a guilty plea to murder in the second degree, but had only
> probed the defendant's interest in the matter.  The judge
> further found that trial counsel did discuss the
> prosecutor's inquiry with the defendant, and he discredited
> the defendant's denial that the discussion had occurred.
> The judge also found that the defendant had no interest in
> pleading guilty because he was confident that his evidence
> of self defense would result in complete vindication of the
> murder charge.

Because the decision of the "gatekeeper" Justice on this issue is

essentially a summary affirmation of the findings and conclusions

of the Superior Court judge denying the motion for a new trial, I

will "look through" to Judge Fecteau's decision, the "last

reasoned decision" for purposes of this analysis.  See Gunter v.

Maloney, 291 F.3d 74, 80 (1st Cir. 2002) (quoting Ylst v.

Nunnemaker, 501 U.S. 797, 804 (1991)).

    After conducting an evidentiary hearing at which he received

testimony from, inter alia, Petitioner, Petitioner's mother, and

Darius Araby, Petitioner's trial counsel and the attorney whose

conduct allegedly constituted ineffective assistance of counsel,

---

    [15]As discussed in Part II.B.2., supra, the Superior Court
judge denied the claim on procedural default grounds, finding
that it was waived because it could have been raised by
Petitioner in his first motion for a new trial, but offered an
analysis of the merits of the claim "[i]n the event that, upon
review, this court's view of the issue of waiver is found to be
without adequate basis" or if various other grounds existed for
reaching the merits.

Judge Fecteau framed the question before him in clear terms:

> The lynch-pin to the issue involving the defendant's claim
> that he received ineffective assistance of counsel can be
> succinctly stated: did the Commonwealth communicate to the
> defendant's counsel an offer to allow him to enter a plea of
> guilty to second degree murder which the attorney failed to
> communicate to the attorney, and if so, would the defendant
> have been willing to enter such a plea of guilt.

Judge Fecteau answered both questions in the negative.

First, as to the matter of whether a plea deal had been
offered, the judge took up the evidence upon which Petitioner
relied in arguing that an offer had been made, namely, a
handwritten note in attorney Araby's file for Petitioner's case,
dated March 28, 1997, that memorialized a phone conversation with
the prosecutor in the case and read: "If you/Vinton want
2nd/murder -- tell me now -- I must approach [victim's] family
asap – don't wait till last minute".

Petitioner argued that the note "reflects a straightforward,
unambiguous, unqualified offer to [Petitioner] to plead guilty to
second degree murder.  To accept the prosecutor's offer, all
[Petitioner] had to do, indeed, the only thing in his power to
do, was to say 'yes.'  If [Petitioner] had known of and approved
the plea offer, he and the prosecutor would have had a
contractual agreement at that point, regardless of whatever
occurred afterward."  But both the Commonwealth and attorney
Araby contended otherwise, stating that the note evidenced only
an inquiry regarding whether Petitioner would be interested in
the possibility of pleading guilty to second degree murder and
not some sort of binding offer.  Furthermore, Judge Fecteau

credited the testimony by attorney Araby that, although he had no
independent memory of having done so, he "absolutely" would have
communicated information of this sort to Petitioner and
explicitly did not credit the testimony by Petitioner that
counsel had failed to inform him of the conversation.

In concluding both that the Commonwealth had not actually
offered a plea deal and, even were such a deal to have been
offered, Petitioner would not have accepted it, Judge Fecteau
stated:

> Here, I find that the defendant's trial counsel had not only
> communicated with the defendant about the possibility of a
> negotiated plea in general, and on more than one occasion,
> but also had told the defendant of the telephone
> conversation with the Commonwealth's attorney.  The
> defendant had consistently told his trial counsel from
> early-on in their relationship that he had no interest in
> pleading guilty and believed he had a strong case for self-
> defense which, if believed, would have been a complete
> defense to the charge.  While trial counsel did not want to
> appear to the defendant to be badgering him into the entry
> of a plea of guilty, and was respectful of the defendant's
> desire to seek an acquittal, he did communicate to the
> defendant all information necessary for the defendant to
> make an informed decision whether to go to trial or to seek
> to enter a plea of guilty to second degree murder.  The
> defendant made an informed decision to seek an acquittal.
> He has failed to demonstrate a 'serious incompetency,
> inefficiency, or inattention of counsel - behavior falling
> measurably below that which might be expected from the
> ordinary fallible lawyer.'  Moreover, since the Commonwealth
> had neither agreed to allow the defendant to enter a plea of
> guilty to second degree murder, nor had it communicated such
> an offer to the defendant, through counsel, the defendant
> has failed to show that his trial counsel 'likely deprived
> the defendant of an otherwise available, substantial ground
> of defense.'

In reaching these conclusions, Judge Fecteau made multiple
factual determinations, including ones regarding the relative
credibility of Petitioner and his trial counsel, after hearing

live testimony at an evidentiary hearing.

Pursuant to the terms of AEDPA, the factual determinations of the state court "shall be presumed to be correct" in this habeas proceeding and Petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  Petitioner has failed to satisfy this burden.  In the portions of his petition that address this aspect of the ineffective assistance of counsel claim, Petitioner recites in cursory fashion his allegations about the supposed plea deal, makes no mention of Judge Fecteau's findings, and provides no basis whatsoever for this court to determine that those findings were clearly erroneous.  Accordingly, I find that Petitioner is not entitled to relief on the basis of this aspect of the ineffective assistance of counsel argument (i.e., Ground One, subpart (a), and Ground Five of the petition for habeas relief).

## III. CONCLUSION

For the reasons set forth more fully above, I GRANT Respondent's motion to dismiss.

/s/ Douglas P. Woodlock
_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE